Page 26

Q. And who would -- again, I assume the foreman would change from day to day.
But who would the supervisor have been in that gang?
A. I don't remember.
Q. And did you also maintain your seniority as a machine operator?
A. Yes.
Q. After you came back to the maintenance of way department, were you able to hold any jobs as a machine operator?
A. I don't remember.
Q. Were you still working in the east seniority district?
A. I think so.
Q. All right. And when was the first time that you heard about Appendix L?
A. I don't remember.
Q. Did you ever hear about Appendix L when you were working in the track department before you went to transportation?
A. I don't remember.
Q. All right. Do you -- were you active in the union when you were in the track department?
A. Yes.

Page 27

Q. And did you go to union meetings?
A. Not every one.
Q. All right. And when you went to union meetings, was Appendix L discussed from time to time?
A. Yes.
Q. And do you recall any discussions about Appendix L when you were in the track department attending union meetings before you transferred over to transportation?
A. I don't remember.
Q. All right. And then once you transferred back to the track department, do you recall that Appendix L was discussed at union meetings?
A. Yes.
Q. So why don't you tell me in general what you recall hearing about Appendix L after you transferred back to the track department at union meetings.
A. At the union meeting, Appendix L came up, and they asked the guys to raise their hand if they would want to vote for Appendix L.
Q. All right. And did someone explain to you what Appendix L was?
A. A little bit.
Q. Did someone provide you with a copy of Appendix

Page 28

L?
A. Yes.
Q. All right. And what, if anything -- well, let me ask you this: Who would have been the person that would have been explaining that to you?
A. The people on the union board.
Q. All right. And do you remember any of the individuals?
A. Kevin Adams, Ben Broz. That's it.
Q. All right. And what is it that you understood Appendix L to say or to provide or to require?
A. It keeps people working.
Q. Other than being told that Appendix L would keep people working, do you have any other recollection regarding what you were told about Appendix L before you voted on it?
A. No.
Q. Are the foremen that are working for the Harbor in the BMWED?
A. Yes.
Q. So would Jerry Perkins be in the BMWED, too?
A. Yes.
Q. Do you recall Mr. Perkins being present at any of the union meetings that you attended when Appendix L was discussed?

Page 29

A. No.
Q. Do you recall Mr. Perkins saying anything about Appendix L?
A. No.
Q. At some point a vote was held on Appendix L at a BMWED meeting, correct?
A. Yes.
Q. And it was just whoever was present got to vote on it?
A. No.
Q. Okay. So there was a more formal process?
A. That was -- they were just seeing who would vote for it, and then they had a day where they were going to vote for it.
Q. And so on the day that they were going to vote for it, was it a vote where you had to go to a meeting to vote or go to a location to vote, or were there ballots sent out in the mail?
A. I think it was at a meeting.
Q. And do you have a recollection as to how long it was before your termination that Appendix L was approved by the union?
A. No.
Q. Were you present at that union meeting when it was voted on?



ABSOLUTE REPORTERS (312) 444-9882
www.absolutereporters.net

EXHIBIT
Group
1

normal Blue Island people working from the west end toward the middle and the Gibson people working from the east end toward the middle with the idea that they would meet somewhere in the middle, finish the track and then move over to the next track?
A. I don't know how they -- how they set that up to work it.
Q. All right. So you had no idea what the planning was that was --
A. Yeah, I had no idea.
Q. All right. And the Blue Island foreman that you were working under at the time that this incident occurred was Miguel Garcia, correct?
A. I know it was Miguel. I don't know his last name.
Q. Okay. And let's just say in the days proceeding this incident, can you identify any other foreman other than Miguel Garcia and Jerry Perkins who were working at Blue Island?
A. I don't know.
Q. All right. Mr. Ritter was the assistant supervisor, correct?
A. Yes.
Q. And was Mr. Ritter at the project on a daily



basis?
A. Yes.
Q. Eight hours a day?
A. No.
Q. Okay. Approximately how long would you estimate that Mr. Ritter would actually be out in the field while the project was ongoing?
A. I have no idea. It could be an hour, or it could be eight hours. It all depends how busy he was.
Q. So at least as you understood it, this was not the only project that Mr. Ritter was supervising at the time that this incident occurred?
A. Yeah, I don't know what he was doing.
Q. All right. And what about Flores?
Did Mr. Flores -- he was the supervisor at Blue Island?
A. Yes.
Q. And so fair to say that he would be the highest ranking track department person at Blue Island?
A. Yes.
Q. But he would also still be in the union, right, a different union but --
A. I think they're a supervisor in the union.
Q. All right. So neither Mr. Ritter nor Mr. Flores at this time were management employees, correct?



A. No, they're not management.
Q. Okay. And neither Mr. Flores nor Mr. Ritter at this time, nor any of the foremen, had the right to make -- had the right to charge any employee with a violation of the rules, correct?
A. You're talking about foremen or --
Q. Foremen.
A. Yeah, foreman, no.
Q. Okay. What about the assistant supervisor and the supervisor?
A. Yes.
Q. Okay. Is your understanding that they would have the right to impose discipline on you?
A. Yes.
Q. Can you identify any employee who was disciplined by Eric Ritter or David Flores during the period of time that you were in the track department at the IHB?
A. The whole entire time?
Q. Yes.
A. I mean, I don't know. I don't know.
Q. Could Mr. Ritter and Mr. Flores impose discipline on an employee without consulting with management?
A. I don't know. I'm not a supervisor.



Q. All right. So essentially then, it would be fair to say that you would agree that foremen could not impose discipline, correct, but that assistant supervisors and supervisors might be able to impose discipline; you're not really sure?
A. Yeah, I'm not for sure how it goes.
Q. Okay. And certainly, any management employee could impose discipline, correct?
A. Yes.
Q. And do you know whether or not assistant supervisors and supervisors had the power under the railroad's agreements to decide how much discipline should be assessed against employees?
A. I don't know.
Q. All right. And that would be true with regard to both the assistant supervisors and the supervisors; you don't know?
A. Yeah, I don't know how -- how they can determine what you get.
Q. All right. And what about the management employees?
Do you have any understanding as to how the railroad's disciplinary system worked relative to decisions on the imposition of

their office. Perkins was in there. They called Pete Woznicki in there, and Flores called Victor Reyes on the phone.
Q. And what happened when Victor got on the phone?
A. He asked what happened; what's going on.
Q. And what happened?
A. Perkins started getting loud, and I guess Victor couldn't hear. And he said, "Okay. Everyone come to the fourth floor now in the main office at Gibson right now."
Q. Was anyone other than Mr. Perkins yelling at this point?
A. I guess everyone -- people talking. Maybe -- yeah, I mean, their voices just getting louder. I don't know about -- no screaming.
Q. Was Mr. Woznicki yelling at Mr. Perkins during this time?
A. I don't believe he was.
Q. Was anyone yelling at Mr. Perkins during this time?
A. No.
Q. Was anyone other than Mr. Perkins being loud when Victor Reyes said, "Okay. Come to Gibson"?
A. Being loud or talking over each other. It could be either one. I think what it was was too many



people were trying to talk at once, and then Victor couldn't understand.
Q. All right. So then from there, what happened?
A. Someone took me -- I got in who's ever gang truck it was, and they drove to the main office.
Q. Do you remember who you rode with to Hammond?
A. Pete Woznicki. I believe Bob Vander Meer was in there, Billy Reno, myself. And I can't remember if there was anybody else.
Q. Was Mr. Perkins with you?
A. I don't think he was in there with us.
Q. Was Mr. Ritter?
A. No, he was not.
Q. Was Mr. Flores?
A. No.
Q. Did Mr. Flores go to Blue Island -- I mean to Hammond from Blue Island?
A. I didn't see him.
Q. But Mr. Ritter did and Mr. Perkins did?
A. Yes, they were there.
Q. But they didn't travel with you?
Is that what I'm understanding?
A. Yes. They drove separate.
Q. All right. And when you got to Hammond, was anyone -- were Ritter and Perkins already there,



or did you guys get there first?
A. I can't remember who got there first.
Q. All right. So then when you got to Hammond, what happened?
A. Went to the fourth floor.
Q. And then what happened?
A. Said I want union representation, and they told me to wait.
Q. Who did you say "I want union representation" to?
A. Victor and, I think, Will Geeve.
Q. Did anyone attempt to talk you out of having your union representative present?
A. No.
Q. All right. So they left you by yourself so that you could talk to your union rep?
A. The union rep wasn't there yet.
Q. Right.
A. Yeah.
Q. All right. But, I mean, nobody tried to get you to talk to them until your union rep came, right?
A. Yes.
Q. All right. So they let you be hands off until your union guy showed up.
And did you make a call for someone to come, or did they or did someone else?



A. I think Billy Reno was driving the truck. I don't know if he called and got Adams up there. I can't remember who called.
Q. And does Kevin Adams -- or at the time, did Kevin Adams work for the railroad?
A. Yes.
Q. Okay. So he was a union rep, but he was also an employee of the railroad?
A. Yes.
Q. All right. And do you know if he was working on that particular day?
A. I believe he was.
Q. All right. Do you know where he came from in order to meet with you?
A. No.
Q. All right. And then when he showed up, did anyone show up with him from the union?
A. I can't remember.
Q. Do you remember if Mr. Bainter was there?
A. Bainter wasn't.
Q. Was not?
A. Was not.
Q. What about Mr. Broz? Was he there?
A. I don't think so.
Q. All right. And then when Mr. Adams arrived, I



ABSOLUTE REPORTERS (312) 444-9882
www.absolutereporters.net

Page 74

Q. Okay. So let me ask you this: From the time that you came back in 2012 or early 2013 until the time that this incident happened, where were you working other than in Blue Island?
A. Gibson.
Q. And was Dave Flores ever your supervisor at Gibson?
A. I don't think so.
Q. Who was your supervisor at Gibson?
A. Oliver Payne.
Q. Okay. Anyone else who would have been your supervisor other than Dave Flores and Oliver Payne from the time that you came back in 2013 until 2014 when this incident occurred?
A. Eric Ritter.
Q. All right. Anyone else?
A. I think that's all.
Q. When Mr. Ritter would have been working as your supervisor, where would that have been?
A. Gibson or Blue Island, wherever he was.
Q. And when you were required to work by yourself, was Mr. Flores responsible for giving you that assignment?
A. I don't know.
Q. Well, who would tell you, "You're going to work

Page 75

by yourself today"?
A. A foreman.
Q. So can you identify any foremen that you worked under since you came back to work in late 2012 or early 2013 who assigned you duties that required you to work by yourself?
A. Joe Tuttle.
Q. Anyone else?
A. Can't remember.
Q. All right. Did you ever have any conversations with Dave Flores that would indicate to you that Mr. Flores was retaliating against you for having filed that original OSHA case regarding your hand?
A. I didn't get my assignments from him. I didn't really talk to Flores.
Q. All right. Did you ever have any conversations with Oliver Payne that would indicate to you that Mr. Payne was retaliating against you because of that initial OSHA case that you filed regarding your hand?
A. No.
Q. Did you ever have any conversations with Eric Ritter that would indicate to you that Mr. Ritter was retaliating against you because of that

Page 76

original OSHA case that you filed involving your hand?
A. Yes.
Q. All right. Why don't you tell me about your conversations with Mr. Ritter.
A. He'd just tell me I'd have to work by myself, make tools. I mean --
Q. All right. So other than Mr. Ritter instructing you to work by yourself, is there any conversation that you ever had with Mr. Ritter that would lead you to believe that you were being told to work by yourself because of your prior OSHA case?
A. I don't remember.
Q. What about Mr. Tuttle?
Did you have any conversations with Mr. Tuttle that would lead you to believe that you were being retaliated against because of your prior OSHA case?
A. Working by myself.
Q. And again -- but I'm talking about anything he said to you.
A. I can't -- oh, I can't remember exact words, what he said to me.
Q. Were there other employees who worked in the

Page 77

track department between January 1st of 2013 and the date on which this incident occurred who you observed being assigned to work by themselves?
A. I can't remember.
Q. Did you ever express to anyone at the railroad your concern that you were being assigned to work by yourself in retaliation for your prior OSHA case involving your hand?
A. Yes.
Q. Who?
A. Jeff Bainter.
Q. So does Mr. Bainter actually work for the railroad, or does he work for the union?
A. He works for the union.
Q. Okay. So before we get to Mr. Bainter, I was sort of focused on the railroad.
So my question was, did you ever communicate to anyone at the railroad that you felt that you were being asked to work by yourself in retaliation for your prior OSHA case?
A. I can't remember.
Q. Did you have any conversations with Victor Reyes?
A. I don't remember.
Q. Did you have any conversations with Davey Flores?
A. I don't remember.

Page 134

A. No.
Q. Did Mr. Flores ever indicate to you that he had any problems with you before June of 2014?
A. No.
Q. What about Mr. Ritter?
Did you have any problems with Mr. Ritter?
A. No.
Q. Did Mr. Ritter ever indicate to you that he had any problems working with you as a result of your OSHA case?
A. I don't think so.
Q. And did you ever find that Mr. Ritter was watching you?
A. No.
Q. What about Mr. Reno?
Did you have any difficulties with Mr. Reno when he was the foreman and you were working at Blue Island in the months before this incident occurred?
A. No.
Q. What about Mr. Woznicki?
Did you have any problems with him in the months before?
A. No.

Page 135

Q. And what about Fabian?
Did you have any problems with him in the months before?
A. No.
Q. All right. So when you were working in Blue Island in the months before this incident happened in June of 2014, would it be fair to say that no one was watching you?
A. Could be.
Q. Well, it either is or it isn't or --
A. Nobody or these guys?
Q. Well, was there someone else that was watching you during that period of time?
A. There was people watching. Like, I told you those names.
Q. The guy who's the foreman, that was when you went back to Blue Island in the month or so immediately prior to the date of your termination?
A. No.
Q. All right. So sometime before your termination, you went back -- you went to Blue Island.
You bid on a job in Blue Island, right?
A. Yes.
Q. And do you remember where you had been working

Page 136

immediately before you went to Blue Island?
A. No.
Q. All right. But you were permanently assigned -- "permanently," that's not a good word in the railroad.
You were regularly assigned to Blue Island at the time, correct?
A. At the time, yes.
Q. And had been for at least a month?
A. I would say yes.
Q. Maybe even longer?
A. Could be.
Q. Okay. And these guys that you just named, Flores, Ritter, Reno, Woznicki and Fabian, were also regularly working at Blue Island at the time?
A. I would say so.
Q. All right. And so for however long it was that you were at Blue Island before your incident occurred and you got terminated, were you feeling that anyone was watching you?
A. No.
Q. All right. And likewise, was anyone telling you that they were not wanting to work with you or being told not to work with you?

Page 137

A. No.
Q. Was anyone telling you that they were not wanting to associate with you or being told not to associate with you?
A. No.
Q. All right. And were you being required to work by yourself?
A. No.
Q. And everyone was talking to you basically?
A. Yes.
Q. And everything was fine?
A. I don't know about fine, but everything was okay.
Q. Okay. Well, what wasn't fine about when you went back that you believed related to your OSHA case?
A. I can't -- I can't remember.
Q. So as you sit here today, you can't recall anything that happened when you went to Blue Island to work on a regular basis that you felt was retaliation against you because of your OSHA case?
A. Not at this time.
MS. KANDYBA: All right. I have to use the restroom again.
And if somebody wants to have a conversation about lunch, we can have it. If you

Page 262

Q. All right. Let's try one more time.
You don't know of any conversations that Victor Reyes had with any supervisors, assistant supervisors or foremen on the railroad that indicated that he wanted them to help him get you, right?
A. Right.
Q. Okay. So anything you know is kind of what you think or what you feel or what your feelings or opinions are about what Victor Reyes did, okay?
And what I'm trying to understand is whether your belief is that Victor Reyes sat down all of the supervisors and all of the assistant supervisors and all of the foremen at the railroad who might ever have occasion to work with you and said, "We're going to get Bish."
A. No, not like that.
Q. Okay. So how is it that -- I mean, were there specific people other than Victor Reyes that you believed were part of this attempt to get rid of you or retaliate against you?
A. I don't know.
Q. All right. So do you feel that Victor Reyes was trying to get David Flores to help him retaliate against you?

Page 263

A. I don't know.
Q. David Flores was, I mean, not someone that you had many problems with in the course of your work for him at Blue Island, right?
A. Never had a problem.
Q. All right. And what about Mr. Ritter?
Do you have feelings that Mr. Ritter was working with Mr. Reyes to retaliate against you?
A. Not -- I don't know. I don't know.
Q. All right. And what about Mr. Perkins?
Do you feel that Mr. Perkins was working with Victor Reyes to retaliate against you?
A. No.
Q. And what about Mr. Geeve?
Was he one of the people?
A. I have no idea.
Q. What about Mr. Grover?
A. Maybe.
Q. All right. And again, just so I'm clear, you don't have any information in your possession about Grover being involved or making any statements that he was trying to get you or help Victor get you or anything like that, right?
A. No.
Q. I'm sorry. My fault. Bad question.

Page 264

I'm correct, what I said, right?
A. Yes.
Q. Okay. All right. Give me one minute and -- oh, let me ask you this: You were aware that Grover retired shortly after you were terminated, right?
A. No.
Q. Did anybody in upper management at the railroad have any involvement directly with you, like Mr. Daly or Mr. Spano or Mr. Kelley or any of those people?
A. Spano headed my investigation, and that's about it.
Q. And again, you never had any one-on-ones with Mary Kay Conley either, correct?
A. I can't recall.
Q. All right. And just so I'm clear, the notification that you were taken out of service was really something that occurred at Gibson, not while you were still physically at Blue Island, right?
A. Yes.
Q. And the formal notice you got the following day, correct?
A. I don't know. I got the out-of-service letter that day. And then the other letter, I don't

Page 265

know when I got it.
MS. KANDYBA: All right. Okay. I don't have anything else.
I will state, however, for the record, that it has now come to light that Mr. Ritter is in possession perhaps of some notes that might be relevant to this case and perhaps should have been disclosed under Rule 26.
And I would at this point make an oral request that those be produced. And in the event that notes are produced, I will reserve the right to depose Mr. Bish with regard to those notes.
MR. THOMPSON: We'll produce any notes that are relevant. We reserve the right to object to reproducing Mr. Bish, but we will revisit that after reviewing the notes.
I'd like a minute with my client.
MS. KANDYBA: Okay.
(Brief recess.)
CROSS-EXAMINATION
BY MR. THOMPSON:
Q. After you returned from your injury, you were told by numerous people that they didn't want to work with you or that they were told not to work with you, right?