Page 13

say, "Well, he didn't violate these rules in this hearing, but there's this other rule I think he violated" and discipline an employee for that?
A **Not if -- Not if it wasn't brought forth in the investigation.**
MR. THOMPSON: Would you please mark this as Exhibit 1?
(Exhibit 1 was marked for identification.)
BY MR. THOMPSON:
Q I'm going to hand you what's been marked as Exhibit 1. It's Defendant's Answers to Plaintiff's Interrogatories.
(Whereupon, document tendered.)
BY MR. THOMPSON:
Q During litigation or a lawsuit, the parties ask each other questions. One of the questions that is asked is who has information about the case.
Regarding you in response to Interrogatory No. 2, it said, "As to the discipline assessed, on information and belief, Rick Grover, IHB's Chief Engineer, and Pat Daly, IHB's General Manager, were involved in the decision to terminate Plaintiffs."
So I want to talk to you about that decision. Okay?
Did you have any role in Mr. Bish being

Page 14

charged with a workplace rule violation?
A **No.**
Q The same with Woznicki, right?
A **That is correct.**
Q You didn't have any role in the -- putting the hearing together?
A **No, I did not.**
Q Your role was solely limited to the actual termination decision, right?
A **Correct.**
Q For Mr. Bish, what was your role?
A **The best of my recollection, Mr. Grover and I had a discussion following the completion of the investigation, and it was determined at that time that, due to the actions by Mr. Bish and Mr. Woznicki -- is that correct --**
Q (Indicating.)
A **-- that their employment with the IHB would be terminated.**
Q Was that a mutual decision?
A **Yes.**
Q Who initiated that conversation?
A **Mr. Grover came to me.**
Q Were you aware of the incident that ultimately culminated in the termination prior to Mr. Grover

Page 15

approaching you?
A **Not that I recall.**
Q What did Mr. Grover tell you about the incident, as best you can remember?
A **He told me that he had some employees that were being insubordinate, and an employee threatened one of our supervisors with physical harm. The other employee refused direct orders from his supervisor. And those actions are not tolerated on the IHB.**
MR. THOMPSON: Let's mark Exhibit 2 and Exhibit 3.
(Exhibit 2 was marked for identification.)
(Exhibit 3 was marked for identification.)
MS. KANDBYA: So Exhibit 2 is what, the Notice --
MR. THOMPSON: Exhibit 2 is the Notice of Discipline for Mr. Bish, and 3 will be the Notice of Discipline for Mr. Woznicki.
MS. KANDBYA: Did you bring numbered copies of these documents or no?
MR. THOMPSON: I did.
MS. KANDBYA: All right. So I have those because I know where they are; but if you want to say it on the record so that we know what we're talking about.

Page 16

BY MR. THOMPSON:
Q So I'm going to hand you Exhibit 2, which is the Notice of Discipline for Mr. Bish. It's Bates labeled IHB 217, and I'm going to hand you Exhibit 3, which is the Notice of Discipline for Mr. Woznicki, which is Bates labeled IHB 257.
(Whereupon, documents tendered.)
BY MS. KANDBYA:
Q Please review those and let me know if you recognize those documents.
(Whereupon, witness perusing documents.)
BY THE WITNESS:
A **No. This is the first I've seen of these documents.**
BY MR. THOMPSON:
Q You know generally what they are, though?
A **Yes.**
Q Those are the letters that inform Mr. Woznicki and Mr. Bish they've been terminated?
A **That is correct.**
Q They're signed by Mr. Shirley, right?
A **That is correct.**
Q But it was actually you and Mr. Grover who made the discipline decision?



EXHIBIT
Group 2

he analyze things? There's a litigation pending in that particular case, and I want to make sure that what we're talking about here is based on what he may have known at the time that it happened because people told him or because he observed it versus what he has subsequently learned as a result of conversations with the general counsel or any outside attorneys who may be involved in that case.

MR. THOMPSON: Understood. I didn't know there was a FELA case going on, so I understand your objection. Let me try and think of a way to get at what I really want to know that has nothing to do with the FELA case.

BY MR. THOMPSON:

Q Let's do this because I think that's going to open just a nest of hornets that I don't really care about.

Fair to say that you guys take hydration seriously?

A **Yes, we do.**

Q And if an employee needs water, you want to make sure he gets it?

A **Yes, we do. We want to make sure it's available for him, and we encourage them to drink water throughout their day, just like if it's**



**zero degrees out, we expect them to seek shelter at times to get themselves warmed up, adjust yourself to the conditions.**

Q And you recognize that if an employee is not allowed to get water when he needs it, that's a safety concern?

A **If that would have happened at any time, yes; that's a safety concern.**

Q Can one employee operate a spiking gun?

A **I don't know.**

Q Did Mr. Grover tell you one way or the other whether Mr. Woznicki and the foreman had engaged earlier in the day in a conversation about track protection?

A **No.**

Q Do you know Mr. Bish?

A **No.**

Q Mr. Donnahue?

A **No.**

Q Mr. Lacefield?

A **No.**

Q Mr. Reno?

A **No.**

Q Mr. VanderMeer?

A **No.**



Q Mr. Woznicki?

A **No. I don't know any of those gentlemen by name, but I've probably talked to them or seen them or been in contact with them in the last four years at some time.**

Q Prior to their termination or the instance that led to their termination, fair to say then you didn't have any reason to believe any of those employees had ever been dishonest?

A **No.**

Q Fair to say you wouldn't have had an opinion as to whether they were hard-working?

A **No.**

Q Fair to say you wouldn't have had an opinion as to whether they were good employees?

MS. KANDBYA: Prior to the incident is the question?

MR. THOMPSON: Yes.

BY THE WITNESS:

A **I have -- I would have no -- I'd have no reason to think they weren't good employees.**

BY MR. THOMPSON:

Q Have you ever been disciplined by IHB?

MS. KANDBYA: Okay. He's the head of the company. Who is it that's going to discipline him?



MR. THOMPSON: That was going to be my very next question.

MS. KANDBYA: That's a ridiculous question.

MR. THOMPSON: Understood.

THE WITNESS: Am I to answer that?

MS. KANDBYA: You go ahead.

BY THE WITNESS:

A **I have never disciplined myself, no, sir.**

BY MR. THOMPSON:

Q Could you be disciplined by IHB?

A **No. I could be disciplined by my board of directors, but not by the IHB.**

Q Has the board of directors ever disciplined you?

A **No.**

Q Are you aware of any allegations of misconduct being made against you insofar as those allegations of misconduct concerned retaliation for reporting safety concerns or injuries?

MS. KANDBYA: I'm sorry. Could you say that again?

MR. THOMPSON: I can restate it.

BY MR. THOMPSON:

Q Are you aware of any allegations of misconduct having been made against you insofar as those allegations concerned retaliating against employees

BY THE WITNESS:
A **How was the question worded again? I'm sorry.**
BY MR. THOMPSON:
Q I'm going to rephrase it anyway. I think it's a poor question upon hearing it reread.
A **I agree.**
Q Is it your experience that union-level employees will lie for one another at investigatory hearings to help each avoid discipline?
A **It has happened.**
Q Is it uncommon?
A **It has happened. I don't know how common, but it has happened.**
Q Here's what I'm wrestling with: You have a foreman who says "Woznicki threatened me." You have a whole bunch of people that are in the same area, would easily hear it, and said Mr. Woznicki didn't say that.
MS. KANDBYA: Is this a hypothetical or are you attempting to summarize the testimony at the investigation transcript? I would just like that clarified now.
MR. THOMPSON: I think it summarizes the transcript, but we can treat it as a hypothetical. I don't think it much matters. I'll reask it as a



hypothetical.
BY MR. THOMPSON:
Q If you have a foreman who testifies Mr. Woznicki threatened me and you have a bunch of employees who say, "We were there. We heard the whole conversation. That didn't happen," how does Mr. Woznicki get fired for that?
A **The foreman is a supervisor. He has proven through the years that he can manage and handle situations sufficiently. The foreman's been working for the railroad for a long time and, with that, he has accepted a lot of responsibility in that position.**
**When a supervisor or a foreman in that position, with as much seniority and experience that he has, states that this incident occurred and this is how it happened, I'm going to believe that supervisor.**
Q Can you identify any other individuals -- Strike that.
That you know of, did Mr. Bish have any prior discipline for insubordination?
A **Not that I'm aware of.**
Q Can you identify any other employees who were terminated for their first time being insubordinate?



A **I'm sure it has happened, but I don't recall any.**
Q At the time you decided to terminate Mr. Bish, did you know that he had suffered an injury previously that resulted in a FELA claim?
A **No.**
Q Did you look at his injury record at all when deciding to terminate him?
A **No.**
Q At the time you decided to terminate Mr. Bish, did you know that he had sued the railroad?
A **No.**
Q The work you guys do on the tracks, it's hard work, right?
A **Yes.**
Q It's physically demanding?
A **It could be at times, yes.**
Q It's important that employees stay hydrated, right?
A **Yes.**
Q Why?
A **It eliminates problems that could be overcome by heat exhaustion or just the normal replenishing of the fluids in your body. It's important to drink water.**
Q Are you aware of any employees that had been injured while working at IHB because they failed to



stay hydrated?
A **I recall -- I think there was one in recent history that had some problems with the heat.**
Q Did it result in an injury?
A **I don't think he injured himself, no. I think he was overcome by heat.**
Q Tell me what you know about that incident.
A **I recall an employee that was walking in the yard and was overcome by the heat and received medical attention because of that.**
Q What was the outcome of that to him physically?
MS. KANDBYA: "What was the outcome" -- You're going to have to speak louder because --
MR. THOMPSON: Sure.
BY MR. THOMPSON:
Q What was the outcome of that to him physically? And what I mean by that, I mean, once he was revived, was he okay? Did he suffer any temporary or permanent consequences that you're aware of?
MS. KANDBYA: I'm going to object on the basis of foundation unless you can establish one.
MR. THOMPSON: Are you instructing the witness not to answer?
MS. KANDBYA: Did you -- I mean, did he review medical records? Did he go to the hospital? Did

*Form LPD-1*

**INDIANA HARBOR BELT RAILROAD COMPANY**

**NOTICE OF DISCIPLINE**

Date: June 24, 2014
File No. 14-087

Certified Mail # 91 7199 9991 7033 4986 4295

Occupation: Trackman ID No. 7111

Mr. D. Bish
273 Heather Lane
Hobart, IN 46342

As a result of the facts developed at the formal hearing held at 1000 hours on June 18, 2014, in the General Manager's Office Conference Room, 2721-161st Street, Hammond, IN, and based on the record of that hearing, attached, it has been determined that you were responsible when you were working in the vicinity of Track 7 in the Blue Island Yard at approximately 1230 hours on June 12, 2014, you disobeyed a direct order given to you by your Foreman Jerry Perkins, when he instructed you to grab the spiking gun and start spiking, you disregarded his instructions. This is a violation of Rule D – Employee Conduct.-----------------------------------------------------------

---

**YOU ARE HEREBY NOTIFIED:**

_____ 1. Your record has been assessed with a letter of reprimand.

_____ 2. Your record has been assessed with __days suspension, of which __ days must now be served. __ days will be held in abeyance.

XXX 3. **You are dismissed from employment with the Indiana Harbor Belt Railroad.**

XXX 4. **Contact Mr. R. Olszowka, Senior Director Risk Management/Chief of Police, IHB RR, 2721 161st Street, Hammond, IN 46323 to meet with a Special Agent to clear out your locker and return your radio/charger, keys, ID and any other company property you may have.**

[signature]
D. Shirley
Manager – Environmental and B&B

cc: R.C. Grover
J. Bainter - BMWE
K. Adams - BMWE
PR FILE

EXHIBIT
#2 RP
5-18-16

IHBBW000217

*Form LPD-1*

**INDIANA HARBOR BELT RAILROAD COMPANY**

**NOTICE OF DISCIPLINE**

Date: June 25, 2014
File No. 14-086

Certified Mail # 91 7199 9991 7033 4986 4288

Occupation: Trackman ID No. 6040

Mr. P. Woznicki
5858 S. Sayre
Chicago, IL 60638

As a result of the facts developed at the formal hearing held at 17:38 hours on June 18, 2014, in the General Manager's Office Conference Room, 2721-161st Street, Hammond, IN, and based on the record of that hearing, attached, it has been determined that you were responsible when you were working in the vicinity of Track 7 at Blue Island Yard at approximately 1030 hours on June 12, 2014, you were given instructions to work; you disobeyed the instructions and threatened your Foreman Jerry Perkins with physical harm. This is a violation of Rule D – Employee Conduct. ------------------------------------------------------------------------

YOU ARE HEREBY NOTIFIED:

_______ 1. Your record has been assessed with a letter of reprimand.

_______ 2. Your record has been assessed with __days suspension, of which __ days must now be served. __ days will be held in abeyance.

XXX 3. **You are dismissed from employment with the Indiana Harbor Belt Railroad.**

XXX 4. Contact Mr. R. Olszowka, Senior Director Risk Management/Chief of Police, IHB RR, 2721 161st Street, Hammond, IN 46323 to meet with a Special Agent to clear out your locker and return your radio/charger, keys, ID and any other company property you may have.

D. Shirley
Manager – Environmental and B&B

cc: R.C. Grover
J. Bainter - BMWE
K. Adams - BMWE
PR FILE

EXHIBIT
#3 KR
5-18-16
depobook.com

IHBBW000257

Page 13

say, "Well, he didn't violate these rules in this hearing, but there's this other rule I think he violated" and discipline an employee for that?
A **Not if -- Not if it wasn't brought forth in the investigation.**
MR. THOMPSON: Would you please mark this as Exhibit 1?
(Exhibit 1 was marked for identification.)
BY MR. THOMPSON:
Q I'm going to hand you what's been marked as Exhibit 1. It's Defendant's Answers to Plaintiff's Interrogatories.
(Whereupon, document tendered.)
BY MR. THOMPSON:
Q During litigation or a lawsuit, the parties ask each other questions. One of the questions that is asked is who has information about the case.
Regarding you in response to Interrogatory No. 2, it said, "As to the discipline assessed, on information and belief, Rick Grover, IHB's Chief Engineer, and Pat Daly, IHB's General Manager, were involved in the decision to terminate Plaintiffs."
So I want to talk to you about that decision. Okay?
Did you have any role in Mr. Bish being

Page 14

charged with a workplace rule violation?
A **No.**
Q The same with Woznicki, right?
A **That is correct.**
Q You didn't have any role in the -- putting the hearing together?
A **No, I did not.**
Q Your role was solely limited to the actual termination decision, right?
A **Correct.**
Q For Mr. Bish, what was your role?
A **The best of my recollection, Mr. Grover and I had a discussion following the completion of the investigation, and it was determined at that time that, due to the actions by Mr. Bish and Mr. Woznicki -- is that correct --**
Q (Indicating.)
A **-- that their employment with the IHB would be terminated.**
Q Was that a mutual decision?
A **Yes.**
Q Who initiated that conversation?
A **Mr. Grover came to me.**
Q Were you aware of the incident that ultimately culminated in the termination prior to Mr. Grover

Page 15

approaching you?
A **Not that I recall.**
Q What did Mr. Grover tell you about the incident, as best you can remember?
A **He told me that he had some employees that were being insubordinate, and an employee threatened one of our supervisors with physical harm. The other employee refused direct orders from his supervisor. And those actions are not tolerated on the IHB.**
MR. THOMPSON: Let's mark Exhibit 2 and Exhibit 3.
(Exhibit 2 was marked for identification.)
(Exhibit 3 was marked for identification.)
MS. KANDBYA: So Exhibit 2 is what, the Notice --
MR. THOMPSON: Exhibit 2 is the Notice of Discipline for Mr. Bish, and 3 will be the Notice of Discipline for Mr. Woznicki.
MS. KANDBYA: Did you bring numbered copies of these documents or no?
MR. THOMPSON: I did.
MS. KANDBYA: All right. So I have those because I know where they are; but if you want to say it on the record so that we know what we're talking about.

Page 16

BY MR. THOMPSON:
Q So I'm going to hand you Exhibit 2, which is the Notice of Discipline for Mr. Bish. It's Bates labeled IHB 217, and I'm going to hand you Exhibit 3, which is the Notice of Discipline for Mr. Woznicki, which is Bates labeled IHB 257.
(Whereupon, documents tendered.)
BY MS. KANDBYA:
Q Please review those and let me know if you recognize those documents.
(Whereupon, witness perusing documents.)
BY THE WITNESS:
A **No. This is the first I've seen of these documents.**
BY MR. THOMPSON:
Q You know generally what they are, though?
A **Yes.**
Q Those are the letters that inform Mr. Woznicki and Mr. Bish they've been terminated?
A **That is correct.**
Q They're signed by Mr. Shirley, right?
A **That is correct.**
Q But it was actually you and Mr. Grover who made the discipline decision?

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| DAVID BISH AND PETER WOZNICKI, | ) | |
| Plaintiffs, | ) | |
| v. | ) | CASE NO. 2:15-cv-00262-JD-JEM |
| INDIANA HARBOR BELT RAILROAD | ) | |
| Defendant. | ) | |

**DEFENDANT'S ANSWERS TO PLAINTIFFS' INTERROGATORIES**

Defendant, Indiana Harbor Belt Railroad Company, ("IHB"), by its attorney, Mary Louise Kandyba, Wilson Elser Moskowitz Edelman & Dicker LLP, for its answers to Plaintiff's Interrogatories, states as follows:

**INTERROGATORY NO. 1:** Identify everyone who has information regarding facts or matters relating to this case and, for each person, state what information Indiana Harbor Belt believes he or she possesses.

**ANSWER: Defendant objects to this Interrogatory on the basis that it is overbroad, not reasonably limited in time or in scope, lacking in specificity, vague and ambiguous. Without waiving this objection, see all persons named in Defendant's Initial Disclosure pursuant to Federal Rule 26, and all supplemental disclosures. See also persons named in Plaintiff's Initial Disclosure pursuant to Federal Rule 26.**

**INTERROGATORY NO. 2:** Identify everyone who participated in the decision to charge Bish and/or Woznicki with and/or discipline Bish and/or Woznicki for violating Rule D – Employee Conduct; describe the manner in which they participated in the decisions; and describe all verbal or written conversations regarding the decision to charge and/or discipline Bish and/or





EXHIBIT #1 PP 5-18-16

Woznicki, including identifying the dates on which the conversations occurred and the conversations' participants and witnesses.

<u>ANSWER</u>: **Defendant did not maintain any records listing the individuals who participated in the decision to charge Bish and/or Woznicki with a rule violation, or when conversations occurred regarding the incident that is the subject of Plaintiffs' Complaint. The circumstances surrounding the charges are detailed in the transcript of the investigations that were held, which have previously been produced in discovery. As to the discipline assessed, on information and belief, Rick Grover, IHB's Chief Engineer, and Pat Daly, IHB's General Manager, were involved in the decision to terminate Plaintiffs.**

<u>INTERROGATORY NO. 3:</u> Identify the custodian and location of all documents identified in response to Plaintiffs' Requests for Production of Documents.

<u>ANSWER</u>: **All documents identified have been produced, and if not produced, are in the possession of Defendant's General Counsel, Joel Cornfeld; Defendant's Director Labor Relations and Human Resources, or Defendant's outside counsel, Mary Louise Kandyba.**

<u>INTERROGATORY NO. 4:</u> Identify the compensation and benefits Bish and/or Woznicki would have received had they not been disciplined for allegedly violating Rule D – Employee Conduct, and describe in detail the factual basis for such identification.

<u>ANSWER</u>: **Defendant objects to this Interrogatory on the basis that the amount Plaintiffs might have earned had they not been terminated cannot be determined with any certainty because of the manner in which job assignments are made under the applicable collective bargaining agreements, and because of the application of Appendix L to BMWED employees. Further answering, Defendant states that it is not obligated to calculate Plaintiff's damages in answering Interrogatories. As to benefits, see documents produced by Defendant in response to Plaintiff's Request to Produce, Request No. 8. Further answering, and without waiving these objections, at**

Page 5

wasting the deponent's time bickering about it during the deposition, we will postpone those questions, bring the matter to the court, and then reconvene, if necessary.

MS. KANDBYA: Correct.

WHEREUPON:

PAT DALY

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, relating to said matter was examined and testified as follows:

EXAMINATION

QUESTIONS BY NICK THOMPSON:

Q Other than meeting with your counsel, what did you do to prepare for today's deposition?
A **Nothing.**
Q Did you review any documents?
A **No.**
Q Have you given testimony under oath before?
A **Yes, I have.**
Q Approximately how many times?
A **About ten.**
Q When was the last time?

Page 6

A **Probably about 20 years ago.**
Q Nothing in the last 20 years, give or take?
A **No.**
Q There's one really important rule throughout today's deposition. If you don't understand my question, I want you to tell me. Okay?
A **Got it.**
Q If you answer, I'm going to assume, then, that you understand my question. Fair enough?
A **Fair enough.**
Q Walk me through your railroad work history.
A **I started for the -- working for the railroad in July of 1974.**

MS. KANDBYA: Make sure you tell him which railroad because "the railroad" will seem like this one.

BY THE WITNESS:

A **In Chicago for the Baltimore and Ohio Chicago Terminal Railway.**

BY MR. THOMPSON:

Q Was that as a management position or nonmanagement?
A **That was in a clerical position.**
Q Have you been in the railroad industry since 1974?
A **Yes, I have.**
Q At what point did you move into a management role

Page 7

for the first time?
A **1980.**
Q With which railroad is that?
A **That was with the Baltimore and Ohio Chicago Terminal Railway Company.**
Q How long did you work for that company?
A **That company was a predecessor of -- which is now known as CSX, and I worked for CSX from July of 1974 until May of 2012.**
Q Was every position you held for CSX or its predecessor a management position after 1980?
A **Yes. I was in management for that entire time.**
Q What's the highest position you achieved at CSX?
A **Vice president network operations.**
Q In layman's terms, what is that?
A **CSX has a consolidated operations center where the day-to-day operations is managed from, and I was in charge of the operations of the entire CSX network.**
Q So you were responsible for moving trains?
A **Moving trains and allocation of resources, maintaining schedules, maintaining the safe operation of the railroad.**
Q When you left CSX in 2012, did you come to IHB?
A **That is correct.**
Q Why did you come to IHB?

Page 8

A **I was offered a position here, and Chicago, being my home, I took advantage of coming back home to Chicago and able to work for this -- for the IHB Railroad.**
Q Cubs fans or White Sox fan?
A **Cubs fan.**
Q What is your position with IHB?
A **General manager, IHB.**
Q In layman's terms, what do you do?
A **I'm responsible for the overall operation and servicing our customers and moving the nation's freight through Chicago.**
Q How many employees report directly to you?
A **As far as a management staff, I have about six employees -- managers that report directly to me.**
Q How many employees indirectly report to you?
A **There's a total of 673 employees on the IHB at this time.**
Q At the end of the day, they all report to you, ultimately?
A **I'm it. I'm the guy.**
Q You're the Grand Poobah?
A **I'm it.**
Q At your time with IHB, have you become familiar with the investigatory hearing process?