Page 17

A Well, Bish has always been quiet, at least around me. It just didn't seem to me that he would do something like that, be insubordinate.
Q Who did you talk to next?
A That's it. After that, I called Mr. Reyes and let him know what was going on. By that time, when I came back to my office, I guess they had called Mr. Woznicki because Mr. Perkins was talking to Mr. Ritter, and I guess Perkins mentioned Woznicki, and they asked him to come in too, and then Mr. Reyes said to get them on a conference call in my office.
So we all got into a conversation call. We're trying to kind of tone down the situation. And once we started talking, Mr. Perkins, Bish, and Woznicki were just basically arguing with each other, fighting. They wouldn't let Mr. Reyes -- You couldn't even hear Mr. Reyes talk. They were just going back at it, back and forth, Mr. Perkins and Woznicki and Bish.
So Mr. Reyes just said, "You know what, guys? Just stop it. I want to see all you guys in my office," meaning, Mr. Ritter, Mr. Perkins, Mr. Woznicki, and Mr. Bish.
Q When you first -- Strike that.

Page 18

I think you said Mr. Bish was in the locker room when you talked to him?
A Yes.
Q When you left the locker room, what was your immediate intent? What were you planning on doing?
A I was just trying to get the whole -- both of the stories, both of the sides of the story, and just tone it down, you know, just end it there, you know, go back, talk to Mr. Perkins and say, "You know what? Let's just stop and start all over."
Q So at that point in time, did you not plan on calling Mr. Reyes?
A We were trying to tone it down just like Mr. Reyes. You know, if that would have happened, then I would have just called Mr. Reyes and said, "You know what? We got it under control. Let's move on."
Q You would have put them back to work?
A Yes.
Q When you go to talk to Mr. Perkins, though, you see he's with somebody else, right?
A At that time, I believe Woznicki was in the office.
Q When you saw him there for the first time, did you have any understanding as to why Mr. Woznicki was there?
A I kind of had an understanding because this was

Page 19

going on for a couple days back and forth with them.
Q When you say "this was going on," what do you mean "this"?
A Well, Mr. Perkins, Woznicki, Bish, and I believe another individual, Reno maybe, they were actually reporting to Gibson, and they were driving to Blue Island where we're at, where the work was, and working there. This was going on for a couple weeks. And just with the talks that they would be arguing from Gibson to Blue Island, so I kind of had an idea. And at that time, that same day, I guess there was an incident earlier with -- I believe it was Woznicki, Bish, and Mr. Perkins, but this was earlier. And once I seen him there, I figured Perkins mentioned his name, and they brought him in also.
Q When you first saw Mr. Woznicki, you didn't know any allegations had been made against him, though?
A No.
Q Fair to say you did know that the whole group had been arguing about something for the last short while?
A Yes.
Q How long had they been working together; do you

Page 20

know?
A I'd say a couple weeks. It's hard for me to -- a couple weeks, maybe.
Q Who told you that the gang had not been getting along?
A Basically, not getting along, just being argumentative against each other; that's all.
Q Who told you that they were being argumentative?
A It's just everybody. It's just the way they were speaking there in the locker room. Everybody talks and you can hear it. They argue there -- Well, not like an argument there, but they'll go back and forth, saying, "You're going to do this." "No, I'm not," you know.
Q So it was common knowledge that the gang had been bickering with one another for a couple weeks; is that fair?
A Yeah, that's -- Yeah.
Q Do you have any understanding as to what they'd been bickering about?
A About the work; one of the -- Mr. Woznicki, on the way to Blue Island, was telling Mr. Perkins, the foreman, that he wasn't going to do any work, that he knows how to get out of work. So Mr. Perkins was telling him, "You're going to work. You're



EXHIBIT
Group 4

Page 45

a union employee.
MR. THOMPSON: I didn't think so.
BY MR. THOMPSON:
Q Did you report to -- Well, strike that. It's a poor question.
To whom do you immediately report?
A **Victor Reyes.**
MS. KANDBYA: I might add that this document is dated 12/23/2010, so it may or may not have been in effect on the date that this incident occurred or any date thereafter.
BY MR. THOMPSON:
Q I'm a little confused.
You said you're a supervisor, right?
A **Yes.**
Q You're also a union-level employee?
A **Yes.**
Q Explain to me how that works.
MS. KANDBYA: How what works?
BY THE WITNESS:
A **We just have a union.**
BY MR. THOMPSON:
Q For supervisors only?
A **Assistant supervisors and supervisors.**
Q What is that union?

Page 46

A **ARASA.**
MS. KANDBYA: Just for the record, do you know what that stands for? American Railroad --
THE WITNESS: American Railway --
MS. KANDBYA: Railway --
THE WITNESS: -- Airline Association, something like that.
MS. KANDBYA: There you go.
THE WITNESS: American Railway --
MS. KANDBYA: Rail and Airline Supervisors --
THE WITNESS: Association.
MS. KANDBYA: -- Association.
BY MR. THOMPSON:
Q Are you aware that federal law prohibits retaliation on the basis of reporting an injury or a safety concern?
A **Yes.**
Q What training does IHB provide you on that law?
A **Not that I've -- I'm not aware of any training on that, unless diversity is included on there.**
Q So you received some training on diversity?
A **Diversity training, yeah.**
Q Based on your testimony, it sounds to me like your involvement in the July 12, 2014 incident --
MS. KANDBYA: Okay. I'm going to assume,

Page 47

again, that you've misspoken because this incident happened in June, not July.
MR. THOMPSON: I apologize.
MS. KANDBYA: And you've been using that July 12th date, but I assumed you had some reason for it --
MR. THOMPSON: No.
MS. KANDBYA: -- but the date of the incident specifically is not that date.
MR. THOMPSON: They both start with a "J" and a "u" followed by a consonant and sometimes a vowel.
BY MR. THOMPSON:
Q Prior to -- Strike that.
Based on your testimony, it's my understanding that your involvement in the June 12, 2014 incident was really limited to being told there was an issue, calling the people in, talking to Mr. Perkins, talking to Mr. Bish, sitting in on a chaotic telephone conference, and then testifying at Mr. Bish's hearing?
A **Correct.**
Q Is that a fair assessment?
A **That's fair.**
Q Other than the information we've discussed, do you

Page 48

think you have any information that's relevant to the June 10, 2014 incident -- I did it again -- June 12, 2014 incident --
A **No.**
Q -- that we should discuss?
A **No.**
MR. THOMPSON: I have no further questions subject to the issue we'll raise with the Court regarding discipline.
EXAMINATION
QUESTIONS BY MARY LOUISE KANDYBA:

Q The track project that was ongoing on at Blue Island at the time that this incident occurred was a significant project, correct?
A **Yes.**
Q And it took a fairly long period of time from start to finish and involved significant numbers of tracks, correct?
A **Correct.**
Q And significant numbers of manpower, correct?
A **Correct.**
Q And in each instance, on every single day that track gangs were working, tracks had to be taken out of service in order for the trackmen to do the

Page 41

A **No.**

MR. THOMPSON: We can end confidentiality, depending on the answer to this question.

MS. KANDBYA: I'm sorry. Could you repeat the question?

(The previous question was read back by the court reporter.)

MS. KANDBYA: Oh, that was answered.

MR. THOMPSON: I just said we can end confidentiality, depending on the answer to this question.

MS. KANDBYA: I thought that was a question before you said, "depending on the answer to this question."

BY MR. THOMPSON:

Q Have you been disciplined by IHB in the past?

MS. KANDBYA: I'm going to object on the basis of relevance, and we're getting really dangerously close -- if you're going to start asking every single employee about this, I'm going to get a protective order because this is inappropriate.

Unless you're telling me that your clients are charging him -- and yesterday Mr. Bish specifically said that he did not think that Mr. Flores was a part of this, because I asked that question -- then

Page 42

his personal disciplinary history is irrelevant to this case, as is any other employees.

Subject to that objection, you can answer the question.

BY THE WITNESS:

A **I don't want to answer that.**

MS. KANDBYA: There you go.

BY MR. THOMPSON:

Q Okay. Just so we're clear --

MS. KANDBYA: No. Just so we're clear, if you want to litigate your right to obtain Mr. Flores' disciplinary history unrelated to this case or to any allegations of retaliation against employees for reporting safety violations or reporting injuries, anything other than that, then I'll be happy to litigate with you.

I can show you a protective order that's already been entered in another case in the Northern District of Indiana on this very issue, and that's his position. He doesn't want to answer. He has that right. I'll be happy to submit it to the Judge, if you think it's necessary, but we're not going to be advising Mr. Flores on the record.

MR. THOMPSON: I'm not advising Mr. Flores

Page 43

anything. What I'm asking is, are you instructing the witness not to answer, or is the witness choosing not to answer despite --

MS. KANDBYA: I can't instruct the witness not to answer. Counsel, you're aware of that. I'm advising the witness that we will litigate the issue of whether or not he is obligated to answer that question if he chooses not to answer it.

MR. THOMPSON: It's still not clear to me, your position. I mean, are you -- You can instruct a witness not to answer. I do it all the time, depending on -- If you're not instructing him not to answer and he's choosing not to answer, that's different. Those are two different issues.

MS. KANDBYA: He said, "I don't want to answer the question."

MR. THOMPSON: Okay.

MS. KANDBYA: And that's good enough for me.

MR. THOMPSON: Fair enough. Well, for purpose of the record then, since it's my understanding that the witness is choosing not to answer, we're not only going to move to compel the answer, we're also going to seek costs from IHB.

BY MR. THOMPSON:

Q Are you aware of any employees other than Mr. Bish

Page 44

and Woznicki alleging that you were involved in misconduct insofar as the misconduct includes retaliation against employees for reporting injuries or safety concerns?

A **Can you repeat that question again so I can understand it a little better?**

Q Yeah; it's a long one.

Are you aware of any employees alleging misconduct against you that involved an allegation that you were part of retaliation against them for reporting either an injury or a safety concern?

A **No.**

Q I'm going to hand you what's been marked as Exhibit 4, which has been produced in this case. It's Bates marked, for the record purposes, 727. It's a structure chart of IHB.

(Exhibit 4, previously marked, was tendered to the witness.)

BY MR. THOMPSON:

Q I don't think I see you on there, but let me know if I'm mistaken.

A **It's blurry. I can't really see this.**

Q Yeah; I have a hard time seeing it as well.

MS. KANDBYA: I don't believe he would be on there because he's not a management employee. He's