Page 22

A. Correct.
Q. Was there ever a time that you and Mr. Reyes would have been working together where you were both in a track gang together?
A. Yes.
Q. And on that occasion, what would his -- would he have been a foreman?
I assume, again, he's senior to you?
A. I don't recall exactly what his title was.
Q. Do you know whether or not you ever worked with Victor Reyes when he was working as a foreman in a track gang?
A. Like I said, I've worked with -- worked with him, but I'm not sure on his title at the time.
Q. All right. So do you know whether or not you ever worked under him when he was an assistant supervisor or a supervisor in a track gang?
A. I don't recall his title.
Q. All right. So did you ever have any problems working with Mr. Perkins before this particular day?
A. No.
Q. Did you ever have any problems working with Mr. Ritter before this particular day?
A. No.

Page 23

Q. Did you ever have any problems working with David Flores before this particular day?
A. No.
Q. Did you ever have any problems working with Victor Reyes before this particular day?
A. No.
Q. And on the previous occasions when you worked for Mr. Perkins, did you ever have any problems with him discouraging you from reporting safety concerns?
A. No.
Q. Did you ever have any problems with Mr. Ritter discouraging you from reporting safety concerns?
A. No.
Q. Did you ever have any problems with Mr. Flores discouraging you from reporting safety concerns?
A. No.
Q. Did you ever have any problems with Mr. Reyes discouraging you from reporting safety concerns?
A. No.
Q. Did you ever have any problems at the IHB with anyone in supervision or management discouraging you from reporting safety concerns?
A. No.
Q. Were you ever injured during the course of your

Page 24

employment with the railroad?
A. No.
Q. All right. Did you ever have occasion to work with someone who was injured while you were working for them or with them?
A. Yes.
Q. All right. And did that happen on more than one occasion?
A. I believe so.
Q. All right. And on that one occasion -- on those occasions when you worked with people who were injured during work, did you become aware of any problems that existed with regard to reporting that injury?
A. Yes.
Q. Okay. Can you tell me about that?
A. A guy got hurt, and Victor Reyes came and picked him up and brought him to the shanty rather than the clinic.
Q. All right. Do you recall who that guy was?
A. Alcantar.
Q. All right. And when he took him to the shanty and not the clinic, were you present with him?
A. I was present the whole time.
Q. All right. Were you present when Mr. Alcantar

Page 25

got injured?
A. Yes, I was.
Q. All right. And what kind of injury was it?
A. An ankle or foot.
Q. All right. He broke his ankle?
A. I'm not exactly sure what the -- what exactly happened, but we were removing track, and a piece of rail swung at him and rolled his ankle over.
Q. Where did that happen?
A. At Gibson.
Q. All right. So you observed -- were you working that day as a machine operator?
A. Yes.
Q. All right. And so you observed that incident occur?
A. Correct.
Q. And what was he working as? Mr. Alcantar.
A. Track laborer, I believe.
Q. All right. And do you recall who the foreman was that day?
A. I do not.
Q. Was there an assistant supervisor working with you?
A. I don't remember.
Q. Was there a supervisor working with you?





EXHIBIT
Group 6

Page 94

but it wouldn't create a significant safety hazard for the workers?
A. Not off the top of my head, no.
Q. All right. So are you then saying that you went along with Mr. Parnitzke bending the track protection rules even though it did create a significant safety hazard for you and the other workers?
A. Just taking orders from my boss.
Q. All right. Well, again, I'm trying to understand why you would -- I mean, you would agree that a violation of those rules could result in someone on the track getting struck by a train, correct?
A. I would say so.
Q. And the primary purpose of those rules -- and this is something that is communicated in your training -- is to protect people who are on the track from getting struck by a train, right?
A. Right.
Q. And I assume you would also agree that people who get struck by trains don't normally do very well health-wise afterwards.
Could we agree on that, too?
A. Yes.
Q. Okay. So I'm trying to understand why you would

Page 95

go along with anything when you have an absolute right to challenge that would endanger your safety or the safety of your friends and coworkers with regard to the violation of track protection rules.
MR. THOMPSON: Objection. It's been asked and answered that he was doing what his boss told him to do.
That being said, you can answer again.
THE WITNESS: Basically, doing what my boss told me to do and didn't want to cause conflict.
BY MS. KANDYBA:
Q. What conflict did you believe you would cause if you expressed a concern about the track protection?
A. If my boss tells me to do something and I question what he's doing, he's probably going to be upset about it.
Q. Can you identify anyone other than Mr. Parnitzke who bent the rules on track protection during the course of your employment at the railroad?
A. Not at the moment.
Q. Do you believe that Mr. Perkins bent the rules on track protection on June 12th of 2014?
A. No. I don't believe he had anything to do with

Page 96

setting up any of the protection.
Q. Do you believe that Miguel Garcia bent the rules on track protection on June 12th of 2014?
A. No, I don't.
Q. Do you believe that Eric Ritter bent the rules on track protection on June 12th of 2014?
A. You said "bent the rules on track protection"?
Q. Right.
A. No.
Q. Do you believe that David Flores bent the rules on track protection on June 12th of 2014?
A. No.
Q. Was Eric Parnitzke employed by the IHB on June 12th of 2014?
A. I don't believe so.
Q. Do you have any knowledge or understanding of the circumstances under which Mr. Parnitzke's employment with the railroad ended?
A. I don't.
Q. So on the day this happened, after you addressed the track protection, how long was it before you had the necessary tools and materials in order to actually start working?
A. I believe I've already answered the question. I said it was probably a couple hours.

Page 97

Q. What time was it when you arrived at Blue Island?
A. Not exactly sure.
Q. What time was it when you reported to Gibson?
A. Reported to Gibson for what? In the morning or in the afternoon?
Q. In the morning.
A. What time was it when I reported to Gibson?
Q. Right.
A. Well, we start at 7:00, so I would assume 6:45.
Q. All right. And is there a physical location at Gibson where you were required to report?
A. Yes.
Q. What is that location?
A. It's just a shanty. I don't know if it has a technical name.
Q. All right. And when you got to the shanty on that particular day, do you know -- did you know that you were going to be working at Blue Island?
A. I don't believe so.
Q. How is it that you first learned that you were going to be working at Blue Island?
A. We have a morning meeting every morning, and the supervisor came out and gives everybody their duties.
Q. And do you recall who the supervisor was?



ABSOLUTE REPORTERS (312) 444-9882
www.absolutereporters.net

A. He was escorted off by the police.
Q. I'm asking you in terms of what year.
A. I don't know the date, no.
Q. And I assume you saw him get escorted out by the police?
A. No, but I know that it happened.
Q. And how do you know that?
A. Because I have friends out here that told me.
Q. And who are the friends out here who told you that Mr. Montagano got escorted off the property by the police?
A. One of the police officers.
Q. And who is that?
A. I don't recall his name.
Q. I thought he was your friend.
A. We haven't talked in a long time.
Q. All right. And what is it that you think that, you know, Mr. Ritter has gotten as his reward for helping Jimmy Majeski get rid of you eventually?
A. Well, he started way after I did and worked his way right up the ladder to a supervisor and assistant supervisor. I don't know if he ever became a supervisor, but I know he's assistant.
Q. Well, he was an assistant supervisor when you were still working here, right?



A. Yeah.
Q. So I'm specifically referring to what reward you believe Mr. Ritter got for this particular incident and your termination and Bish's termination.
A. Well, he's got a higher up job, doesn't he?
Q. Wasn't he --
A. How did he work his way up the ladder so fast?
Q. Wasn't he an assistant supervisor when this incident occurred in 2014?
A. Yes.
Q. And isn't he an assistant supervisor today?
A. I couldn't tell you. I don't work here anymore.
Q. And whether he's a supervisor or an assistant supervisor, aren't those both union jobs?
A. I don't know. I've never had one.
Q. Did you ever bid on one?
A. No.
Q. Did you ever try to get one?
A. I would never do it.
Q. So you don't care then?
A. I do care. But in this company, when you're a supervisor, you're basically a puppet, that you're going to do as you're told, or you're not going to be a supervisor very long.



Q. And who --
A. That's how --
Q. Who's the puppeteer if it's not -- I mean, if you're the puppet, who's the puppeteer then?
A. It would be the next guy up in the rank.
Q. All the way up to Mr. Daly?
A. I don't believe Mr. Daly gets all the information. I believe the guys below him try to handle things their own way --
Q. So who is --
A. -- and don't go about it very smoothly.
Q. And so who's the puppeteer in -- since Mr. Majeski, quote/unquote, "retired," who's the puppeteer?
And since Mr. Montagano got escorted off the property by the police, who's the puppeteer?
A. Who took Jimmy Majeski's job?
Q. I don't know. I'm asking you.
Who's the puppeteer?
A. I would assume that it was Victor Reyes, the one that signs all these paperworks that he didn't have anything to do with.
Q. And so basically, it's your testimony that Victor has all of these people beneath him who are somehow indebted to him because he's done things



for them, like getting them, in the case of Mr. Perkins, back to a job they like from a job they didn't like.
Is that what you're saying?
A. Yes.
Q. Okay. I think I asked you this before, but you're not currently employed, correct?
A. I'm not.
Q. And have you been employed at all since your termination?
A. I have not been.
Q. Have you looked for any jobs?
A. I have.
Q. Where have you looked for jobs?
A. I applied at the CN Railroad.
Q. Anything else?
A. No. That's it.
Q. What job did you apply for at the CN?
A. Basically, general. I think I did apply for one dispatcher job but general as well.
Q. And when you say "general," what is that?
You just send a resume in online and basically say, "I'll take any job you want to give me"?
A. Pretty much. That's how I got the job here.